(No. 86-CC-0821

CARMEN J. OLIVO, Administrator of the Estate of Jose Luiz Olivo, Claimant, *v.* THE STATE OF ILLINOIS and/or its Department of Mental Health and Developmental Disabilities, Respondents.

*Opinion filed October 19, 1993.*

REED, SCOBY, & TRAINOR, LTD. (RICHARD TRAINOR, of counsel), for Claimant.

ROLAND W. BURRIS, Attorney General (JOHN R. BUCKLEY, Assistant Attorney General, of counsel), for Respondent.

## OPINION

MITCHELL, J.

The Claimant, Carmen J. Olivo, seeks compensation for the death of her son, Jose Luiz Olivo, on November 1, 1983, at the Shapiro Developmental Center located in Kankakee, Illinois. Shapiro Developmental Center is operated by the Illinois Department of Mental Health and Developmental Disabilities. There are two issues to be addressed in this matter. First, whether the State, through its agents, over-medicated the decedent and therefore deviated from the standard of care. Secondly, whether the actions of the Shapiro staff personnel in restraining the decedent violated the standard of care.

Jose Luiz Olivo was 33 years old at the time of his death. He had been at the Shapiro Developmental Center since September 11, 1973. Jose was diagnosed as moderately mentally retarded with an I.Q. of 40. He also had a history of psychotic episodes which included aggressive behavior. While at Shapiro, Jose received the drug Thorazine. Thorazine is used to treat people who have psychosis. Psychosis is a psychiatric condition in which a person's ability to perceive reality has become defective. Other symptoms include agitation and anxiety.

According to the Physician's Desk Reference (PDR), which lists the manufacturer's recommendations, 500 mg. of Thorazine is generally a sufficient daily dose to control acutely agitated or disturbed patients. While gradual increases to 2,000 mg. a day or more may be necessary, there is little therapeutic gain to be achieved by exceeding 1,000 mg. a day for an extended period. Thorazine is known to have side effects on the central nervous system. These side effects include neuromuscular or extra-pyramidal reactions. These extra-pyramidal reactions include

agitation or motor restlessness; dystonia, which is a muscle spasm, involving the neck muscles and swallowing mechanism; as well as Parkinson-like symptoms.

At the time of his death, Jose was receiving approximately 1,000 milligrams of Thorazine daily. He also was receiving a drug called Artane. Artane is prescribed to counter Parkinson-like symptoms and other reactions to the Thorazine.

On November 1, 1983, Jose Olivo was observed by Robert Dean, his group leader, as being agitated and upset. Mr. Dean also noticed that Jose was more hyper than usual both before and during breakfast. After breakfast, Mr. Dean instructed Jose to clean his room. Jose became upset with this and began slamming doors and ran into another group's area. Mr. Dean, along with another technician, followed Jose into the other area. The two men took Jose by the arms and tried to get him to sit down. When this was not successful, it was necessary to put Jose on the ground.

Jose was being physically restrained on the ground by technicians Robert Dean, Mark Larimer and Doug Jones. Jose was on his back at first and then it became necessary to put him on his stomach. At some point during the struggle, there were four technicians present, one holding each of Jose's arms and legs. This struggle went on for 10 to 20 minutes and according to Novella Morris, another technician, Jose was stating that he wanted to be held still.

After approximately 20 minutes, Jose stopped struggling. He was not moving at all. William DeBlouwe, another technician, tried to tickle Jose to get a response. There was testimony to the effect that on previous occasions Jose would evidently close his eyes and pretend he was sleeping. The staff would then tickle him in order to

arouse him. Apparently, when the tickling "didn't work," Mr. DeBlouwe then performed the Heimlich maneuver on Jose, causing him to vomit. Novella Morris then tried to perform CPR on Jose, without success.

Paramedics from the Kankakee Fire Department arrived on the scene at about 8:30 a.m. The paramedics were not successful in reviving Jose and he was removed to the hospital. The coroner found the immediate cause of death to be asphyxia due to aspiration of vomit.

At the hearing before this Court, both sides brought in medical experts. The Claimant brought in Dr. Nelson Borelli, a board certified psychiatrist, to testify on her behalf.

Dr. Borelli testified that he felt Jose Olivo was overmedicated while he was a resident of Shapiro Developmental Center. At the time of his death, Jose was receiving 1,000 mg. of Thorazine along with a dose of Artane. According to Dr. Borelli, Jose was exhibiting the symptoms of overdosage of Thorazine and that is why he was given the drug Artane. Artane is used to control some of the adverse reactions to the Thorazine.

Jose Olivo died from asphyxia due to aspiration. Dr. Borelli is of the opinion that Jose Olivo's death was caused by the reactions to Thorazine and the way he was restrained by Shapiro personnel. Jose was very agitated that morning and it became necessary for the employees to physically restrain him. During the struggle to restrain Jose, he vomited and subsequently choked on that vomit.

Based on his medical opinion, Dr. Borelli felt that Jose's agitation, as well as his impaired gag reflex, was due to being given excessive doses of Thorazine over a prolonged period of time. The doctor also believed that if the Shapiro staff would have been trained in the proper way to restrain a patient, Jose's death may have been avoided.

The staff, by having Jose's arms crossed against his chest while laying on his stomach, caused Jose to vomit. There also was a staff member on Jose's back as they attempted to hold Jose down. Dr. Borelli felt the staff members should have checked Jose more closely during the struggle for possible signs of distress. This was not done and in Dr. Borelli's opinion, this negligence by the Shapiro staff also contributed to the death of Jose Olivo.

The State relied on Dr. Daniel Luchins, also a board certified psychiatrist, as their expert. Dr. Luchins felt that, in his opinion, the dosage of Thorazine given to Jose Olivo was not excessive and would not have significantly suppressed his gag reflex. Based on the medical records reviewed by Dr. Luchins, he is of the opinion that Jose was not suffering any serious side effects of the medication given to him while at Shapiro Developmental Center. The doctor also testified that in his experience, he has never seen a patient that had a suppression of the gag reflex due to Thorazine. Dr. Luchins also testified that according to the latest scientific literature there is no scientific evidence that Thorazine, in its standard clinical doses, interferes with the gag reflex.

Dr. Luchins stated that in his opinion the best way to determine the effective dosage of the drug would be to test the blood level. According to the medical records, Jose's blood level of Thorazine was 49. The therapeutic range given is between 30 and 300. Dr. Luchins testified that Jose's therapeutic range was low with low potential for side effects.

Dr. Luchins also testified that he did not feel the low white blood count (4500) for Jose was of major concern. He stated that a normal range was 6,000 to 10,000 white blood cells and it was not until the count dropped below 4,000 that the medication should be stopped. Dr. Luchins

was of the opinion that a standard side effect of antipsychotic drugs is a lower white blood cell count. Dr. Luchins stated that since Jose's white blood cell counts remained constant over a couple of years, it was not necessary to test Jose's blood more extensively.

Dr. Luchins testified he did not feel the Shapiro staff was negligent in the way they restrained Jose. In his opinion, there is no perfect way to restrain someone when they are attacking other people. When a person is struggling, it is hard to put them in restraints. When it is necessary to restrain someone, the staff is trained in certain ways to control the arms and legs. It is Dr. Luchins' opinion that something happened while Jose was being restrained which led to his death, but it was not the negligent actions of the employees that caused Jose's demise.

In order for a claimant to prevail, she must show by a preponderance of the evidence that the State owed the claimant a duty, this duty was breached, that the claimant was free of contributory negligence and that the State's breach was the proximate cause of death. *Mazurek v. State* (1975), 30 Ill. Ct. Cl. 247, 249.

In this case before us, the decedent, Jose Olivo, was receiving approximately 1,000 mg. of Thorazine on a daily basis for 2½ years prior to his death. Both Dr. Borelli and Dr. Luchins testified that the level of medication exceeded the manufacturer's recommendation as listed in the Physician's Desk Reference. Jose was also receiving a drug called Artane. Artane is prescribed to counter Parkinson-like symptoms which are side effects of Thorazine.

Jose Olivo was administered doses of drugs which exceeded the manufacturer's guidelines. The coroner found the immediate cause of death to be asphyxia due to aspiration of vomit. Suppression of the gag reflex is a side

effect of being over-medicated with Thorazine. A dosage of drugs which exceeds the manufacturer's guidelines creates *prima facie* evidence of negligence. The State is responsible for the negligent actions of its doctors who treated the decedent. *Cyperstein v. State* (1981), 35 Ill. Ct. Cl. 22, 25.

The Claimant argues that the Shapiro staff was negligent in their attempt to restrain Jose and this also contributed to his death. The staff at Shapiro or at any other center has a responsibility to maintain order and protect all of the patients. When someone is in an uncontrollable state as Jose was, the staff members must do what they can to maintain order. Although the staff received some training on how to restrain a patient, it is not always possible to use the proper textbook techniques. It is not clear by the preponderance of the evidence that the actions of the Shapiro staff constituted negligence in their attempt to restrain Jose and maintain order at the center.

The decedent's family has also made a claim for pecuniary losses and loss of society sustained by reason of the death of Jose Olivo. The testimony of Carmen Olivo and the rest of her family show the family did maintain a relationship with Jose despite the fact he was hospitalized. Where there are parents surviving a deceased child, there is a presumption of substantial loss even when the decedent and the lineal kinsmen are adults.

Although perhaps not crystal clear, the preponderance of the evidence presented suggests that the State did indeed breach its duty in the care of Jose Olivo by exceeding the recommended dosages of his medication and by having done so for a lengthy period of time. Jose Olivo was free from contributory negligence in the fact he only took the medication he was told to take. Therefore, based on the evidence, the Claimant, Carmen J. Olivo, Administrator of the

Estate of Jose Luiz Olivo, is awarded the sum of $50,000 for the estate. Further, the Claimant, Carmen J. Olivo, is awarded the sum of $50,000, Miguel Olivo is awarded the sum of $30,000, Edwin Olivo is awarded the sum of $20,000 and Luz Olivo is awarded the sum of $20,000.